2016 COA 85

**The PEOPLE of the State of Colorado, Plaintiff–Appellee,**

v.

**Bernardine NARDINE, Defendant–Appellant.**

**Court of Appeals No. 11CA2514**

Colorado Court of Appeals, Div. III.

Announced June 2, 2016

444

Cynthia H. Coffman, Attorney General, John T. Lee, Assistant Attorney General, Denver, Colorado, for Plaintiff–Appellee.

Douglas K. Wilson, Colorado State Public Defender, Meghan M. Morris, Deputy State Public Defender, Denver, Colorado, for Defendant–Appellant.

Opinion by JUDGE LICHTENSTEIN

¶1 Defendant, Bernardine Nardine, appeals the judgment of conviction entered on a jury verdict finding him guilty of unlawful sexual contact on an at-risk juvenile.

¶2 In this appeal, we must resolve whether section 18–6.5–103(7)(c), C.R.S. 2015, the applicable at-risk statute, requires proof that the actor "knew" that the victim was an at-risk individual. If so, we must determine whether Nardine's conviction should be vacated because the evidence was insufficient as to this mens rea element or reversed based on an inaccurate jury instruction.

¶3 Nardine also challenges the propriety of his conviction, alleging numerous instances of prosecutorial misconduct during closing argument. We must decide whether, in the aggregate, such misconduct warrants a new trial. He also asserts other evidentiary and instructional errors.

¶4 For the reasons discussed below, we conclude that the applicable at-risk statute does not require proof that the actor "knew" that the victim was an at-risk individual. But we agree that a new trial is warranted due to the nature and pervasiveness of the prosecutor's misconduct.

## I. Background

¶5 On the afternoon of the alleged incident, R.A., then seventeen years old, was helping her stepfather do yardwork at a friend's rental property. Meanwhile, Nardine was visiting Gerald Garcia, who lived in the house next door. Nardine came into the yard where R.A. and her stepfather were working, offered them water, and remained there for a while. R.A. and her stepfather returned home after they finished the yard work.

¶6 Later that evening, R.A. told her parents that Nardine had hugged her, touched her breasts, and put his hands down the back of her pants to touch her buttocks. R.A.'s mother and stepfather called the police. The following day, in a written statement R.A. also alleged that Nardine had threatened her with a knife when the two of them went inside Garcia's house to get some more water.

¶ 7 Based on R.A.'s allegations, Nardine was charged with one count of unlawful sexual contact on an at-risk juvenile and one count of menacing. *See* §§ 18–3–404, 18–6.5–103(7)(c), C.R.S. 2015. The at-risk charge was based on R.A.'s status as a person with a disability—a mental illness.

¶ 8 The case proceeded to a jury trial, and the prosecution acknowledged that it was placing R.A.'s mental health at issue to support the at-risk charge.

¶ 9 R.A. testified about the above-described incident and about how she has severe depression and psychosis. She also testified that she had been hospitalized in the past due to mental illness. She admitted that she has heard voices and experienced visual hallucinations, and that she has had flashbacks to sexual abuse she suffered during her childhood. She said that on the day Nardine touched her, she was hearing voices and was having flashbacks to the childhood abuse. But she also explained that what happened with Nardine was not a hallucination or a flashback, stating that "[i]t really happened." She further testified that "at first I didn't know what was going on and then [G]od revealed it to me."

¶ 10 R.A.'s therapist was called as a prosecution witness. She was qualified as an expert and testified that R.A. was "a person with a mental illness" as defined by statute. She explained that R.A. suffered from mood disorder, psychotic disorder, post-traumatic stress disorder, and had been previously diagnosed with schizoaffective disorder. She testified about the symptoms R.A. experiences, particularly auditory and visual hallucinations and emotional instability.

¶ 11 R.A.'s stepfather and Garcia also testified. R.A.'s stepfather agreed that Nardine had offered them water. At about this same time, he saw Nardine hug R.A. He then told R.A. not to be around or to hug Nardine, and she was never out of her stepfather's sight again the rest of the afternoon.

¶ 12 Garcia testified that during that afternoon, R.A. and Nardine twice came into his house to get water. Both times he was with R.A. and Nardine, so they were never alone. He also saw Nardine and R.A. talking in the yard and on the front porch, but he never saw Nardine hug, touch, or threaten R.A.

¶ 13 The prosecution introduced evidence of two prior incidents involving Nardine. A woman, A.A. (no relation to R.A.), testified that approximately one year before the incident with R.A., when she was eighteen years old, Nardine had lifted her shirt and bitten her breast while she was cleaning his house. Garcia's neighbor, Betty Avalos, testified that nearly thirty years ago, when she was about fourteen years old, Nardine had often grabbed her hands or put his arm around her when she delivered newspapers to him on her delivery route.

¶ 14 The defense theory of the case was that the alleged sexual contact against R.A. did not occur and, instead, R.A. had a flashback or hallucinated the events with Nardine.

¶ 15 The jury ultimately convicted Nardine of unlawful sexual contact, but it acquitted him of menacing. The court sentenced him to five years of sex offender intensive supervised probation.

## II. Statutory Interpretation: Unlawful Sexual Contact Against At–Risk Juveniles, § 18–6.5–103(7)(c)

¶ 16 Nardine contends that section 18–6.5–103(7)(c) has an implied mens rea element that requires the prosecution to prove that a defendant knew of the victim's at-risk status. Because of this, he argues the evidence was insufficient to convict him of felony unlawful sexual contact. He likewise argues that the trial court erroneously instructed the jury because it submitted a special interrogatory that did not include a mens rea for the at-risk element. We disagree with his interpretation of the statute and therefore reject his claims of insufficient evidence and instructional error.

### A. Standard of Review

¶ 17 Statutory interpretation is a question of law that we review de novo. *Hunsaker v. People*, 2015 CO 46, ¶ 11, 351 P.3d 388.

## B. Discussion

¶ 18 The prosecution charged Nardine with unlawful sexual contact, which, as pertinent here, is defined as follows: "[a]ny actor who knowingly subjects a victim to any sexual contact commits unlawful sexual contact if ... [t]he actor knows that the victim does not consent." § 18–3–404(1)(a).

¶ 19 Generally, this offense is a class 1 extraordinary risk misdemeanor. § 18–3–404(2)(a). But the complaint also alleged that "the victim was an at-risk juvenile." *See* § 18–6.5–103(7)(c). Section 18–6.5–103(7)(c) states that "[a]ny person who commits unlawful sexual contact, as such crime is described in section 18–3–404 ..., and the victim is ... an at-risk juvenile, commits a class 6 felony."

 ¶ 20 In interpreting whether this at-risk juvenile penalty-enhancing provision contains a mens rea element as to a victim's at-risk juvenile status, our goal is to effectuate the General Assembly's intent. *See People v. McCoy*, 2015 COA 76M, ¶ 38, 2015 WL 3776920. To determine that intent, we begin with the language of the statute itself, and we give words and phrases "their 'plain and ordinary meaning.'" *People v. Back*, 2013 COA 114, ¶ 17, 2013 WL 3943162 (quoting *People v. Dist. Court*, 713 P.2d 918, 921 (Colo.1986)).

¶ 21 The terms of section 18–6.5–103(7)(c) are clear and unambiguous. The statute's plain language references the underlying crime, "unlawful sexual contact." It then prescribes a more severe penalty if "the victim is ... an at-risk juvenile." § 18–6.5–103(7)(c). The additional proof of the victim's "at-risk" status—which elevates the penalty—does not contain an express mens rea requirement. *See People v. Davis*, 935 P.2d 79, 86 (Colo. App.1996) (the plain language of section 18–6.5–103(4), robbery from an at-risk adult, does not require that a defendant knew the victim's age).

¶ 22 But our analysis does not stop here. As Nardine points out, if a statute does not contain a culpable mental state, one may nevertheless be required for the commission of that offense or for some or all of its material elements, but only "if the proscribed conduct necessarily involves such a culpable mental state." § 18–1–503(2), C.R.S. 2015.

¶ 23 Nardine asserts that, here, the proscribed conduct necessarily involves a "knowingly" mens rea as to the victim's at-risk juvenile status because the legislature's purpose in enacting the at-risk statute is to deter a would-be criminal from knowingly taking advantage of a vulnerable person. Based on our review of the at-risk statutory scheme, we are not persuaded.

¶ 24 All of Article 6.5 of the Colorado Criminal Code is dedicated to crimes committed against at-risk victims. *People v. McKinney*, 99 P.3d 1038, 1041 (Colo.2004). "In the legislative declaration to Article 6.5, the General Assembly expressed its intent to impose more severe penalties for specified crimes when the victim is 'at-risk.'" *Id.* The legislative declaration, however, does not mention deterrence of would-be criminals or focus on the offender's awareness of a victim's status. Rather, it focuses on the at-risk victim's inability to protect himself or herself as effectively—or to recover as swiftly—from crime, compared to a victim who is not at risk.

¶ 25 The General Assembly recognized that at-risk victims are "more vulnerable to and disproportionately damaged by crime" and are "far more susceptible than the general population to the adverse long-term effects of crimes committed against them." § 18–6.5–101; *see McKinney*, 99 P.3d at 1043. The General Assembly explained that at-risk victims are less likely to fully recover from crimes committed against them, and a significant number of at-risk victims are "not as physically or emotionally equipped to protect themselves or aid in their own security as non-at-risk adults and non-at-risk juveniles in society." *McKinney*, 99 P.3d at 1043 (quoting § 18–6.5–101).

¶ 26 Accordingly, we do not discern from the legislative purpose that the at-risk juvenile enhancer necessarily involves a "knowingly" mens rea as to the victim's at-risk juvenile status.

¶ 27 Nardine nonetheless points to other statutes where the legislature has expressed its intent to require a culpable mental state

as to a victim's status. In particular, he references statutes in which the legislature has required proof that a defendant "knows or reasonably should know" the status of the victim, *see* § 18–3–202(1)(e), (e.5), C.R.S. 2015, or has the "intent to intimidate or harass another person because of that person's" status, § 18–9–121(2), C.R.S. 2015.

¶ 28 He argues that these statutes illustrate that "a mens rea is required" in order to elevate the penalty for the underlying offense. We are not persuaded for two reasons. First, none of these cited statutes are penalty enhancers. They define substantive offenses. Second, these statutes illustrate that the legislature knows how to require a mens rea as to the status of a victim when it intends to do so. The legislature could have done so by express language in the at-risk juvenile statute. But it did not. *See People v. Drennon*, 860 P.2d 589, 591 (Colo.App.1993).

¶ 29 Nardine next argues that, as a policy matter, transforming unlawful sexual contact from a misdemeanor to a felony should be based on the moral blameworthiness of the offender, and that the statute will achieve that goal only if the actor is aware of the juvenile's at-risk status (here, awareness that R.A. was mentally ill). However, it is the legislature's prerogative, not ours, to define crimes and punishments to advance its policy goals. *See People v. Enlow*, 135 Colo. 249, 266, 310 P.2d 539, 548 (1957) (observing that the responsibility of the courts is "to analyze and resolve the law as it is"; policy is to be determined by the lawmaking body); *see also Burrage v. United States*, 571 U.S. ——, ——, 134 S.Ct. 881, 892, 187 L.Ed.2d 715 (2014) (noting that the role of the court is to apply the statute as it is written, even if it thinks some other approach might accord with good policy).

¶ 30 Finally, Nardine argues that without knowledge of the status of his victim, he is being punished more harshly for the same conduct as described in misdemeanor unlawful sexual conduct, in violation of his equal protection rights. *See* U.S. Const. amend. XIV; Colo. Const. art II, § 25.

¶ 31 The General Assembly may establish more severe penalties for acts that it

believes have graver consequences. *People v. Haymaker*, 716 P.2d 110, 118 (Colo.1986). But in order to comport with equal protection guarantees, "statutory classifications of crimes must be based on differences that are real in fact and reasonably related to the purposes of the legislative enactments." *People v. Wilhelm*, 676 P.2d 702, 704 (Colo.1984). As previously discussed, in enacting the at-risk statutory scheme, the legislature identified a victim's status as the differentiating factor to support a more severe penalty because at-risk victims are "more vulnerable to and disproportionately damaged by crime" than non-at-risk victims. § 18–6.5–101. And, at-risk victims are "less able to protect themselves against offenders" and are "far more susceptible than the general population to the adverse long-term effects of crimes committed against them." *Id.* We conclude that the General Assembly identified a differentiation that is "real in fact" and "reasonably related to the purpose" of establishing a more severe penalty for crimes against this vulnerable population. We therefore conclude that the legislature's classification and attendant penalty is consistent with equal protection guarantees.

¶ 32 After examining section 18–6.5–103(7)(c), and considering Nardine's various arguments, we conclude that a defendant need not know that the victim is "at-risk" in order to be convicted of unlawful sexual contact on an at-risk juvenile. Consequently, we reject Nardine's challenges to the sufficiency of the evidence and the special interrogatory.

### III. Prosecutorial Misconduct

¶ 33 Nardine contends that numerous instances of prosecutorial misconduct during closing argument, in their totality, rise to the level of plain error and require reversal of his conviction. Under the circumstances of this case, we agree.

### A. Relevant Law and Standard of Review

¶ 34 A prosecutor has a duty to refrain from using improper methods to produce a conviction. "Prosecutors have a higher ethical responsibility than other lawyers because of their dual role as both the sovereign's representative in the courtroom and as

advocates for justice." *Domingo–Gomez v. People*, 125 P.3d 1043, 1049 (Colo.2005). They must make sure that "justice be done in every case and not necessarily that the prosecution 'win.'" *People v. McBride*, 228 P.3d 216, 221 (Colo.App.2009) (quoting *Domingo–Gomez*, 125 P.3d at 1049).

¶ 35 A prosecutor may not use arguments calculated to inflame the passions and prejudices of the jury, denigrate defense counsel, misstate the evidence, or assert a personal opinion as to the credibility of witnesses. *People v. Gladney*, 250 P.3d 762, 769 (Colo.App.2010). Even in light of the wide latitude given for closing arguments, a prosecutor's arguments and rhetorical flourishes must stay within the ethical boundaries drawn by our supreme court. *Domingo–Gomez*, 125 P.3d at 1048. A prosecutor's argument should be restricted to the evidence and reasonable inferences to be drawn therefrom on the issue of whether the prosecutor has proved guilt beyond a reasonable doubt. *People v. Ferrell*, 200 Colo. 128, 131, 613 P.2d 324, 326 (1980).

¶ 36 In deciding a claim of prosecutorial misconduct, we engage in a two-step analysis. *Wend v. People*, 235 P.3d 1089, 1096 (Colo.2010). First, we must determine whether the prosecutor's challenged conduct was improper based on the totality of the circumstances, and, second, we must determine whether such conduct warrants reversal according to the proper standard of review. *Id.*; *see also Domingo–Gomez*, 125 P.3d at 1048.

¶ 37 Where, as here, a defendant does not object at trial to the now-challenged conduct, we will only reverse a conviction if the conduct was improper and rises to the level of plain error. *People v. Nerud*, 2015 COA 27, ¶ 51, 360 P.3d 201.

## B. Discussion

¶ 38 Nardine argues that the prosecutor improperly (1) characterized the defense theory as a disingenuous scheme commonly perpetuated by defense attorneys to take advantage of victims with mental illness to obtain wrongful acquittals; (2) appealed to the jurors' religious beliefs and "lambasted" the defense theory by characterizing it as an attack on these beliefs; (3) argued that defense counsel did not believe his own client; (4) argued facts outside the record; and (5) vouched for witness credibility.

¶ 39 Under the circumstances of this case, we agree that many instances of the prosecutor's challenged conduct were improper. And, in its totality, the nature and pervasiveness of the conduct constitutes plain error that requires reversal.

### 1. Propriety of the Prosecutor's Closing Argument

#### a. Wrongful Acquittals

¶ 40 We first address Nardine's challenge to the prosecutor's remark that defense attorneys take advantage of mental illness to obtain wrongful acquittals.

¶ 41 The prosecutor argued:

*In every single case* in which an act [sic] risk victim comes to police and said, look how I was abused by this defendant, look what this man did to me. And it becomes an issue for the defense to say she's mentally ill. She has hallucinations, she has flashbacks, she has nightmares, she has— then it seems like automatically, everything they say can't be trusted. *And the perpetrators get away with it.*

(Emphasis added.)

¶ 42 The prosecutor's argument did not relate to the evaluation of the mental health evidence in this case, but improperly appealed to the passions and prejudices of the jury by diverting its attention to the purported conduct of defense attorneys in other cases. The argument inappropriately invoked community sentiment against wrongful acquittals allegedly caused by defense attorneys who manipulate juries and vulnerable victims. *See Harris v. People*, 888 P.2d 259, 265 (Colo. 1995) (concluding that prosecution improperly encouraged the jurors to employ their passions in evaluating the evidence); *ABA Standards for Criminal Justice: Prosecution Function and Defense Function* 3–5.8 Commentary (3d ed. 1993) ("Predictions about the effect of an acquittal on lawlessness in the community also go beyond the scope of issues in the trial and are to be

avoided."). And more, the argument was misleading because, here, it was the prosecution that had placed R.A.'s mental illness at issue.

### b. Religion

¶ 43 We next turn to the prosecutor's comments implicating religion and religious beliefs. These comments arose from the defense theory that R.A. either was having flashbacks, hallucinations, or a dream. This theory was based on R.A.'s admission that at the time of the incident she was having auditory hallucinations, flashbacks to prior childhood sexual abuse, and that she had a dream that she was threatened with a knife. R.A. also testified during cross-examination that she did not immediately tell her parents what happened because "at first I didn't know what was going on and then [G]od revealed it to me."

¶ 44 Both Nardine and the prosecutor elicited from R.A.'s therapist that although R.A. has had auditory hallucinations, her reference to God was not an auditory hallucination, but rather reflected her strong spiritual belief system. The prosecutor also elicited from R.A.'s stepfather that R.A. has "strong convictions in her love for Jesus." Defense counsel did not elicit any further testimony on this subject.

¶ 45 But the prosecutor argued during his initial closing argument as follows:

Well, that's nice that any time anybody thinks they're talking to [G]od or has a religious belief or wants to seek guidance from Christ or the [L]ord, we need to be in a psychiatric hospital. You know, I'm—if any of you are religious, I suggest to you that, you know, are we supposed to hide our religious beliefs? Are we supposed to— we're not going to tell anybody that I sought an answer from the [L]ord because we might be committed to a psychiatric hospital?

. . . .

Now, it's not uncommon if somebody is puzzled or somebody has questions about something and they want to address their maker, they want to address the [L]ord, and they come to the realization or they come to enlightenment about something, to attribute that to [G]od.

For that, they're incompetent? For that, you can't trust a word that she says? If you carry the defense counsel's argument to its logical extreme, that's what they're saying.

All [R.A.] is saying is that she got that enlightenment that he was being manipulative in his words, and she attributes that to the [L]ord. There is nothing unusual about that.

¶ 46 Nardine contends that these remarks improperly appealed to the jurors' religious beliefs and mischaracterized the defense theory as a general attack against religion and religious people. We agree. A prosecutor must avoid arguments that are calculated to appeal to jurors' biases and prejudices. *Domingo–Gomez*, 125 P.3d at 1049. Religion, perhaps more so than any other subject, "evokes intensely personal, and deeply held, feelings." *State v. Ceballos*, 266 Conn. 364, 832 A.2d 14, 47 (2003). Therefore, when prosecutorial statements challenged as misconduct involve references to religion, courts must scrutinize carefully the content, context, spirit, and import of the remarks, while affording due weight to the often deeply inflammatory nature of such statements. *Id.* Religious appeals "are incompatible with the concept of a fair trial because of the likelihood that such references will sweep jurors beyond a fair and calm consideration of the evidence." *State v. Sanchez*, 142 Idaho 309, 127 P.3d 212, 218 (App.2005).

¶ 47 The prosecutor's remarks were prompted by Nardine's defense theory. Nardine's defense theory was based on R.A.'s admitted flashbacks and hallucinations during the incident and included an inquiry into the significance of R.A.'s statement that "[G]od revealed" the crime to her. But the prosecutor's argument went far beyond addressing this evidence and rebutting the defense theory.

¶ 48 The prosecutor mischaracterized the defense theory as being synonymous with the belief that religious people are necessarily mentally ill or delusional. He suggested that defense counsel's argument "taken to its logical extreme" was that "we," as religious peo-

**452**

ple, are "incompetent" and belong in psychiatric hospitals if "we" have a religious belief or "seek guidance from Christ or the [L]ord."

¶ 49 This was not the defense theory, and was particularly misleading because it was the prosecution that had placed R.A.'s mental illness and history of psychiatric hospitalization at issue. By suggesting that Nardine's theory of defense was a condemnation of religious people, the prosecutor created a sense of animosity against defense counsel and Nardine's theory of defense, risking the integrity or fairness of the trial. *Wend*, 235 P.3d at 1097.

¶ 50 The prosecutor exacerbated this risk by aligning himself with the jurors (and with R.A.) by highlighting and defending their shared religious beliefs, including their practice of seeking answers from God. He acknowledged that it is "not uncommon" to seek and get enlightenment from God and "[a]ll [R.A.] is saying is that she got that enlightenment."

¶ 51 These remarks inappropriately encouraged the jury to decide the case based on passion and emotion rather than on a rational assessment of the evidence. *People v. Dunlap*, 975 P.2d 723, 758 (Colo.1999); *see also Sanchez*, 127 P.3d at 218 ("Reference to ... religious beliefs, when made principally to inflame jurors, constitutes prosecutorial misconduct."). And more, by appealing to the jurors' religious sympathies and their shared beliefs, the prosecutor's remarks risked the implication that R.A.'s testimony was credible because it was inspired by God. *See* CRE 610 ("Evidence of the beliefs or opinions of a witness on matters of religion is not admissible for the purposes of showing that by reason of their nature his credibility is impaired or enhanced."); *cf. State v. Bolen*, 219 W.Va. 236, 632 S.E.2d 922, 929 (2006) (finding prosecutorial misconduct where the State's remarks "clearly had the potential to mislead the jury into thinking that [the victim] couldn't possibly be untruthful" because he was a very religious man).

### c. Counsels' Personal Beliefs

¶ 52 Nardine next contends that the prosecutor wrongly suggested that both he and

defense counsel believed R.A.'s allegations of unlawful sexual contact.

#### i. Prosecutor's Personal Belief

¶ 53 Nardine challenges two remarks as improper expressions of the prosecutor's belief. The first was the comment that "as a prosecutor, you don't put a witness on the stand, point the finger at a guy and say, this is what he did to me, if you don't have anything else that supports her credibility." But this comment must be reviewed in context. The prosecutor immediately followed this statement by referring to the jury instruction on credibility and highlighting that the jury could consider "the degree to which [R.A.'s] testimony is corroborated or supported by other witnesses." Thus, we do not agree that this remark was improper. *See, e.g., People v. Constant*, 645 P.2d 843, 845–46 (Colo.1982) ("Counsel can with propriety comment on how well and in what manner a witness measures up to the tests of credibility set forth in the instruction.").

¶ 54 We agree, however, that the second comment, that "all the witnesses I present to you, I presume they're telling the truth," improperly focused on the prosecutor's personal belief. *See Domingo–Gomez*, 125 P.3d at 1049, 1052.

#### ii. Defense Counsel's Personal Belief

¶ 55 Nardine next contends that the prosecutor inappropriately argued that defense counsel did not believe his case was meritorious. He asserts that the prosecutor mischaracterized defense counsel's cross-examination of R.A. in order to make this argument.

¶ 56 Defense counsel had impeached R.A. with her prior written statement, which did not include her later claim that Nardine had threatened her with a knife. From this exchange, the prosecutor argued to the jury that "the defense [is] telling you that what she told her parents and what she told the police the night it happened is probably credible. I submit to you, that's a strong argument, ladies and gentlemen." We agree the prosecutor mischaracterized defense counsel's cross-examination to inappropriately

suggest that defense counsel did not believe in his client's case. *See People v. Jones*, 832 P.2d 1036, 1038–39 (Colo.App.1991) (It is error to imply that "opposing counsel did not have a good faith belief in the innocence of her client.").

#### d. Facts Not in Evidence

¶ 57 Nardine next asserts that the prosecutor argued facts not in evidence to vouch for R.A.'s credibility.

¶ 58 The first example that Nardine cites occurred during the prosecutor's opening statement, when he told the jury that at first R.A. did not realize she had been abused and had to reflect on it. He told the jury that this was "not an uncommon reaction among female sexual assault victims." This comment implicated specialized information pertaining to social science that is not commonly known to laypersons, and because the prosecutor never presented any testimony—much less expert testimony—to support this comment, he should not have made it. *See People v. Davis*, 280 P.3d 51, 53–54 (Colo.App.2011) (concluding that a prosecutor's comment on the "stages" experienced by trauma victims, where no expert testimony corroborated prosecutor's implication that he had specialized knowledge of trauma victims, was error).

¶ 59 The second challenged comment occurred during both opening statement and closing argument. The prosecutor described Nardine as a person who has a particular intention: he is attracted to, preys on, or seeks out disabled women who seemingly cannot defend themselves because of their disabilities. But there was no evidence that R.A.'s or A.A.'s disabilities were outwardly apparent to Nardine (and thus would alert him to a vulnerability), or that he was otherwise aware of their disabilities. Because this significant portrayal of Nardine's "intent" was not rooted in the evidence, it was improper. *Domingo–Gomez*, 125 P.3d at 1048.

¶ 60 Third, during closing argument, the prosecutor referenced "voluminous medical records" that "the defense knows, and that I know" that were not placed before the jury. While it was inadvisable for the prosecutor to mention these medical records, we

conclude that when read in context, the prosecutor's argument about these medical records referenced only evidence that had already been presented to the jury during the testimony of R.A.'s therapist.

#### e. Mental Illness

¶ 61 Nardine contends that it was improper for the prosecutor to argue that R.A.'s mental illness did not affect her during the incident, but that her mental illness qualified her as an at-risk juvenile. We are not persuaded.

¶ 62 Nardine does not offer any legal support for the proposition that a diagnosis of mental illness is insufficient for an individual to be an at-risk victim, or that an at-risk victim must have "active" and untreated mental illness during the assault. *See* § 18–6.5–102(4), (11)(e), C.R.S. 2015 (at-risk juveniles include those with mental illness; no requirement that it be untreated).

### 2. Reversal Is Warranted Under Plain Error Review

¶ 63 Prosecutorial misconduct during closing arguments rarely constitutes plain error that requires reversal. *Constant*, 645 P.2d at 847. To warrant reversal, the misconduct must be obvious and substantial and so undermine the fundamental fairness of the trial as to cast serious doubt on the reliability of the judgment of conviction. *People v. Miller*, 113 P.3d 743, 750 (Colo.2005). Only prosecutorial misconduct which is "flagrantly, glaringly, or tremendously improper" warrants reversal. *Domingo–Gomez*, 125 P.3d at 1053 (quoting *People v. Avila*, 944 P.2d 673, 676 (Colo.App.1997)).

¶ 64 While "[t]he lack of an objection may demonstrate defense counsel's belief that the live argument, despite its appearance in a cold record, was not overly damaging," *People v. Rodriguez*, 794 P.2d 965, 972 (Colo.1990) (quoting *Brooks v. Kemp*, 762 F.2d 1383, 1397 n. 19 (11th Cir. 1985)), such deference must be tempered to allow an appellate court to correct particularly egregious errors, *Wilson v. People*, 743 P.2d 415, 420 (Colo.1987). For, above all, it is the appellate court's responsibility to avoid a

miscarriage of justice for a defendant even when defense counsel fails to object to serious errors at trial. *See Wend*, 235 P.3d at 1097–98 (citing *United States v. Young*, 470 U.S. 1, 15, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985)). Ensuring fundamental fairness in trial is the beacon of plain error review. *Id.*

¶ 65 Thus, plain error review depends on the particular facts and context of a given case because only through examining the totality of the circumstances can the appellate court deduce whether error affected the fundamental fairness of the trial. *Id.* We focus on the cumulative effect of the prosecutor's statements using factors including the exact language used, the nature of the misconduct, the degree of prejudice associated with the misconduct, the surrounding context, and the strength of the other evidence of guilt. *Id.*

¶ 66 Even if the prosecutorial remarks are improper, they do not necessarily warrant reversal if the combined prejudicial impact of the statements does not seriously affect the fairness or integrity of the trial. *Domingo–Gomez*, 125 P.3d at 1053. However, in this case, the pervasive misconduct casts serious doubt on the reliability of the verdict.

¶ 67 The prosecutor repeatedly diverted the jurors' attention from the facts of the case. He appealed to community sentiment to argue that "[i]n every single case" defense attorneys manipulate mentally ill people to gain wrongful acquittals, allowing "the perpetrators [to] get away with it." He made an emotional appeal to their religious convictions. In doing so, he mischaracterized and denigrated the defense theory, suggesting that the defense was belittling his and the jurors' religious beliefs by implying that they, as religious people, were "incompetent" and belong in "psychiatric hospitals." And, he highlighted defense counsel's alleged disbelief in the defense (by mischaracterizing defense counsel's cross-examination) and his own belief in the truthfulness of his witnesses, even referring to facts outside the record to bolster his arguments.

¶ 68 The misconduct is particularly prejudicial because this case depended almost entirely on the jurors' assessment of R.A.'s

credibility, as there was no eyewitness or physical evidence to corroborate her claims. In this type of case, there was a significant risk that these pervasive and emotionally charged arguments led to a guilty verdict based on reasons other than the evidence presented at trial.

¶ 69 We therefore conclude that because the misconduct so undermined the fundamental fairness of the trial as to cast serious doubt on the reliability of the verdict, reversal is required.

## IV. Character Evidence: CRE 404(a) and CRE 404(b)

¶ 70 Because the propriety of the admission of character evidence may arise on retrial, we will address Nardine's challenges to this evidence.

¶ 71 Nardine contends that the trial court should have excluded CRE 404(a) character evidence that he was "a sexual predator" and "not a very good person." He also contends that the court should have excluded CRE 404(b) evidence that Nardine had bitten A.A.'s breast and that thirty years ago Nardine persistently hugged or put his arm around Betty Avalos. We agree with the first contention but agree only in part with the second contention.

### A. Standard of Review

¶ 72 We review a trial court's decision to admit evidence for an abuse of discretion, and we will not disturb that ruling on appeal unless it was manifestly arbitrary, unreasonable, or unfair. *Yusem v. People*, 210 P.3d 458, 463 (Colo.2009).

### B. CRE 404(a)

¶ 73 We agree with Nardine that the witness statements about him being "not a good person" and a "sexual predator" are inadmissible under CRE 404(a).

¶ 74 As pertinent here, CRE 404(a) provides that evidence of a person's character or character trait is not admissible to prove that he acted in conformity with that character on a particular occasion.

¶ 75 Betty Avalos testified that she walked across the street and warned R.A.'s stepfather to "keep an eye" on Nardine because he "could be a possible sexual predator." Later, R.A.'s stepfather similarly testified that "Miss Avalos told me was that I should watch [R.A.] and keep her away from that man [Nardine] because he's not a very good person."

¶ 76 This conversation about Nardine's character only tends to show that he acted in conformity with his character and committed the charged sexual acts against R.A. This is precisely what CRE 404(a) prohibits.

¶ 77 Even if we assume this evidence has some probative value to explain why Avalos told R.A.'s stepfather to keep an eye on Nardine, the characterization of a defendant as a "bad person" due to his being a "sexual predator" is so inflammatory that the danger of unfair prejudice substantially outweighs this minimal probative value. See People v. Walters, 148 P.3d 331, 337 (Colo.App. 2006) (using the word "lurking" was prejudicial because it "implied that defendant ... linger[ed] near schools for a sinister purpose, as would a sexual predator"); see also CRE 403. This evidence should not be admitted on retrial.

### C. CRE 404(b)

¶ 78 We next consider Nardine's challenges to the admission of CRE 404(b) evidence that (1) Nardine hired A.A. to do housework and then came up behind her and bit her breast when she was cleaning his house and (2) thirty years ago Nardine persistently hugged or put his arm around Avalos when she was delivering newspapers.

¶ 79 CRE 404(b) prohibits the admission of evidence about a defendant's other crimes, wrongs, or acts when offered to show his bad character and that he acted in conformity with that character. Kaufman v. People, 202 P.3d 542, 552 (Colo.2009). However, this evidence may be admissible for other purposes, including to show motive, intent, common plan, scheme, or method of operation. Id. With regard to sexual offenses, the General Assembly has recognized that evidence of other sexual acts has a heightened probative value and may be admissible for the above or other non-propensity purposes even when incidents are remote from one another in time. See § 16–10–301, C.R.S. 2015.

¶ 80 Before admitting such evidence, the court must find that (1) the proffered evidence relates to a material fact; (2) the evidence is logically relevant; (3) the logical relevance is independent of any inference that the defendant committed the crime charged because he was acting in conformity with his bad character; and (4) the probative value of the evidence is not substantially outweighed by the danger of unfair prejudice. People v. Spoto, 795 P.2d 1314, 1318 (Colo.1990). Here, following an evidentiary hearing, the trial court ruled that evidence of Nardine's acts against A.A. and Avalos met the Spoto factors because Nardine had a similar intent, motive, common plan, scheme, and method of operation in "all instances."

#### 1. The Incident against A.A.

¶ 81 Nardine advances three reasons why the trial court abused its discretion when it permitted evidence about the A.A. housecleaning incident. He argues that this incident (1) had no logical relevance to motive and intent other than to show propensity; (2) could not be relevant to show common plan or scheme because it occurred over one year prior to the incident with R.A.; and (3) could not be relevant to show method of operation (modus operandi) because this purpose is relevant only to prove identity and must share highly distinctive characteristics with the charged offense. We address and reject each of these contentions.

¶ 82 First, we conclude that the evidence is logically relevant independent of the impermissible inference that Nardine has "bad character" or a propensity to be a sexual offender. It focuses not on a character trait or propensity, but rather it asks the fact finder to infer that Nardine had a motive and intent to develop an encounter with and isolate R.A. (while she was busy doing yardwork) in order to sexually contact her. This inference tends to refute Nardine's argument that the alleged unlawful sexual contact in a secluded location did not occur. See People v. Cousins, 181 P.3d 365, 371 (Colo.App.2007)

(evidence of motive is relevant to prove a crime was committed). We conclude, however, that because A.A. testified that she is not disabled and has never been designated disabled, but only has bad eyesight, a fact finder could not infer from her testimony that Nardine had a motive or intent to approach R.A. because she had a disability.

¶ 83 Second, we reject Nardine's argument that because the A.A. incident was separated by over one year from the instant case, it did not constitute a common plan or scheme. The legislature has expressly provided that in the prosecution of sexual offenses, evidence of another act for the purpose of "common plan, scheme, [or] design" may be introduced, "regardless of whether the charged offense has a close nexus as part of a unified transaction to the other act." § 16–10–301(3); *see People v. Williams*, 2016 COA 48, ¶ 25, 2016 WL 1385329 (other sexual act evidence offered to prove modus operandi or common plan is treated somewhat differently in sexual assault cases).

¶ 84 Finally, we reject Nardine's argument that modus operandi can be relevant only to prove identity (which was not a disputed issue in this case). In prosecutions for sexual offenses, other sexual act evidence is admissible to prove modus operandi "regardless of whether identity is at issue." § 16–10–301(3); *see Williams*, ¶ 25. And where, as here, the evidence demonstrating a modus operandi is not being offered to prove identity, but instead for other purposes such as showing intent or that the crime actually occurred, a lower degree of similarity is required to support the admission of the other act. *See People v. Jones*, 2013 CO 59, ¶ 38, 311 P.3d 274.

¶ 85 When the trial court admitted evidence of this other act, it excluded evidence that the incident with A.A. resulted in a conviction, did not refer to the incident as a "crime," and expressly instructed the jury that it could not use A.A.'s testimony for the propensity inference. We therefore perceive no abuse of discretion in the court's admission of this other act evidence.

¶ 86 On retrial, we conclude this evidence may again be presented for the purposes of showing motive, intent, and method of operation, so long as the procedural protections of section 16–10–301 are followed.

### 2. The Avalos Incident

¶ 87 Nardine next contends that the evidence about the decades-old incident against Avalos is too speculative, too remote in time, and is not distinctive enough to be admitted for motive, intent, common plan or scheme, or modus operandi.

¶ 88 Avalos testified that when she was about fourteen years old, delivering newspapers, Nardine and his father would often grab her arms or try to hug her and not let go. She would have to pull to get away. During those incidents, Nardine never made any attempt to grab her breasts or her buttocks.

¶ 89 We agree with Nardine that this evidence was not logically relevant to the proffered purposes. To be sure, R.A. testified that Nardine asked her for a hug, which she gave him. But evidence of Nardine's and his father's attempts to forcibly grab a fourteen-year-old's arms or hug her—nearly thirty years before the alleged incident with R.A.— was too speculative to permit a jury to infer that Nardine had the intent, motive, plan, or method to isolate R.A. (who was seventeen years old at the time) in order to touch her breasts or buttocks. *See People v. Whitlock*, 2014 COA 162, ¶¶ 19–21, 2014 WL 6808793 (concluding that other act evidence was inadmissible where there may have been a markedly different motivation and perspective).

¶ 90 And because we have concluded that Avalos's description of Nardine as a "bad person" or "sexual predator" is not admissible on retrial, we likewise conclude that this incident with Avalos is not admissible as res gestae evidence to explain these comments.

### V. Unanimity Instruction

¶ 91 Finally, Nardine alleges that the court should have sua sponte given a special unanimity instruction because there were two separate acts that could have formed the basis of the sexual contact: touching R.A.'s breast in the yard or putting his hands down her pants to touch her buttocks in Garcia's house. Because this issue is not likely to arise

in the same posture on retrial, we need not address it.

## VI. Conclusion

¶ 92 The judgment of conviction is reversed, and the case is remanded for a new trial.

JUDGE FOX and JUDGE VOGT * concur.