**UNITED STATES of America, Appellee,**

v.

**Joseph MAURO, Appellant.**

**No. 379, Docket 74-2124.**

United States Court of Appeals, Second Circuit.

Argued Nov. 6, 1974.

Decided Nov. 25, 1974.

Certiorari Denied March 24, 1975. See 95 S.Ct. 1426.

---

Aaron Schacher, Brooklyn, N. Y. (Arnold E. Wallach, New York City, of counsel), for appellant Mauro.

Paul B. Bergman, Asst. U. S. Atty. (David G. Trager, U. S. Atty., E.D.N. Y., Lee A. Adlerstein, Asst. U. S. Atty., of counsel), for appellee.

Before KAUFMAN, Chief Judge, and ANDERSON and MULLIGAN, Circuit Judges.

IRVING R. KAUFMAN, Chief Judge:

The inevitably uneven pace at which amendments to the Federal Rules of Criminal Procedure must be adopted presents us in this case with a novel question concerning the requirement of timeliness for motions to suppress. Joseph Mauro, convicted on several charges of counterfeiting, attacks on this appeal the denial of his suppression motion which was made for the first time during the course of trial. We affirm.

A statement of the convoluted facts will assist in making clear that the motion to suppress was untimely. Shortly after his release from prison in June of 1970, Louis Stoppiello found himself in need of money. Unable to acquire sufficient income to satisfy his needs through the customary channels, he turned to borrowing. Accordingly, he was introduced by Sal Seminara to Joseph Mauro, who loaned sums of money to Stoppiello. By October of 1971 Stoppiello had fallen far behind in his steep interest payments, and he and Mauro commenced discussions on ways in which the repayment might be made. The method ultimately arrived at proved satisfactory to both, though it contributed little to the solution of the current problem of inflation. Mauro undertook to supply Stoppiello with counterfeit bills in denominations of $10 and $20, and Stoppiello sold them at about 30% of the face amount. The proceeds of the sales were applied toward accrued interest on the debt owed Mauro.

The pressures of the task of distributing counterfeit money proved to be somewhat wearing on Stoppiello, leading to his admission to the Brooklyn Veterans' Administration Hospital. But his hope that he could be shielded in a hospital setting from the strains of his venture were short-lived, for on December 10, 1971 he received a visit there from his friend Seminara, who was accompanied by a man introduced as "Mickey." Unknown to Stoppiello, Seminara had agreed to cooperate with the Government, and his companion was in fact Secret Service agent Michael Reilly. Always alert to new business opportunities, Stoppiello sold Reilly eight $10 bills, telling him at the same time that larger transactions could be arranged, although the price would have to be set by his supplier, "Joe." In a later telephone conversation, Stoppiello quoted Joe's figure at $27 per $100 face amount. The two men met again on December 30, after Stoppiello's release from the hospital,

at which time Reilly was given two more counterfeit bills. Shortly thereafter, they agreed to exchange $5000 in false bills on January 4, 1972, at Bay Parkway and 72nd Street in Brooklyn.

On the morning of January 4, Stoppiello met with Mauro and one Lenny Bilz at Anton's Luncheonette, a store located close to where the transaction was to take place. When Reilly failed to appear at the scheduled hour, Stoppiello telephoned him and arranged a new appointment for 2:00 P.M. the same afternoon. Mauro in the meantime had become apprehensive over Reilly's trustworthiness, and so he instructed Stoppiello and Seminara, who had just arrived, that they were to make the transfer. Accordingly, Stoppiello removed the money from between some magazines in the back seat of Mauro's light green 1967 Mustang which was parked nearby, and took it to the basement of his apartment house located opposite from Anton's Luncheonette.

Shortly after 2:00 P.M. Reilly, accompanied by agent Rick Zaino, arrived at Bay Parkway and 72nd Street in a blue Cadillac. Approximately seven other agents were stationed in the immediate vicinity. Stoppiello and Seminara appeared momentarily, then departed to retrieve the counterfeit bills from Stoppiello's apartment, as Reilly drove into a nearby gasoline station to telephone his office. While he was on the telephone, Mauro drove into the station in his green Mustang, accompanied by Bilz. Mauro watched Reilly intently during his conversation, then walked over to him, as he was leaving the telephone, and frisked him. Had Reilly been carrying a gun—which he was not—it would have confirmed Mauro's suspicion that he was an agent. After the two had returned to their respective cars, Mauro maneuvered his Mustang to within two car lengths of Reilly's Cadillac,

where he remained throughout the unfolding events.

Stoppiello and Seminara soon returned, and Seminara entered the Cadillac, carrying the money in a brown paper bag. Reilly then opened the trunk of his car—a signal to the seven agents nearby. Mauro and Bilz were immediately arrested and simulated arrests were also made of Reilly, agent Zaino, and Seminara. Stoppiello, who had fled, was apprehended at his apartment several hours later. As a result of the foregoing, Mauro's Mustang was seized and delivered to the Custom's Bureau Seizure Room for forfeiture pursuant to 49 U.S.C. §§ 781, 782 (1970).

After his arrest and appropriate warnings, Stoppiello spoke freely with the agents about Mauro's involvement, but refused to testify against Mauro. Apparently because the Plan for Achieving Prompt Disposition of Criminal Cases in the Eastern District of New York might require dismissal of the charges for failure to proceed to trial against Mauro, the complaint against him was dismissed upon the Government's motion on February 15, 1972.[1] Stoppiello, however, was indicted, and on March 3 he agreed to cooperate. He informed agent John Viggiano that the steering column of Mauro's Mustang had several counterfeit bills hidden in it. Without a warrant, Viggiano quickly went to Maxford's Garage in Manhattan, where the car was stored, and extracted from the steering column five $10 bills whose serial numbers matched those printed on the money Seminara had given Reilly on January 4. Ten days later Mauro petitioned for reclamation of the car, and upon its return repaired the steering column at a cost of $150. The forfeiture proceedings which had been instituted were then abandoned by the Government.

---

1. We recently recognized that a witness's refusal to testify is not equivalent to "unavailability" which, under the Plan, will have the effect of tolling the running of the six-month period within which the Government must be ready for trial. United States v. Flores, 501 F.2d 1356 (2d Cir. 1974). Dismissal of the complaint would, however, have that effect. Id. at 5149–50.

Despite these adversities, Mauro continued undaunted in his lending activities. He continued to meet with Stoppiello, pressing him for the still unpaid principal and interest. Stoppiello, whose sentence was adjourned after a plea of guilty to passing two counterfeit notes on December 30, 1972, agreed to continue his cooperation with the Government by concealing a small transmitting device on his person to record his conversations with Mauro. Tapes of their discussions on June 15, June 28, and July 12, 1972 provided full substantiation of Mauro's involvement in the January 4 transaction. In the course of the July 12 conversation Mauro also stated that he and his then attorney, George Rosenbaum, had learned of Stoppiello's role in the discovery of the bills in the steering column of the Mustang from the files at the Bureau of Customs.

Because of Stoppiello's belated testimony and the information contained in the tapes, an indictment was returned against Mauro on July 13, 1972, charging possession and transfer of the 500 counterfeit bills which Seminara had given Reilly, and conspiracy to possess and sell counterfeit money.[2] After pretrial proceedings on January 8, 1974, Aaron Schacher—who replaced Rosenbaum as Mauro's counsel—made extensive requests relating to the taped conversations. The Government furnished Schacher with a full transcript of the conversations on January 14, 1974 and Schacher and Mauro listened to the tapes on January 26, 1974. On March 4, seven days after the trial had begun, Mauro moved—on the basis of material supplied several days before by the Government pursuant to 18 U.S.C. § 3500— to suppress the money found in the steering column of his car. The district court denied this motion, finding the warrantless search and seizure reasonable since the Mustang had lawfully been seized for forfeiture, and also be-

cause there had been no unreasonable delay in the forfeiture proceedings. Moreover, Judge Mishler held that the motion to suppress was untimely. Mauro was subsequently convicted of conspiracy to deal in counterfeit money, 18 U.S.C. § 371 (1970), possession of 500 counterfeit $10 Federal Reserve Notes, 18 U.S.C. § 472 (1970), and transfer of these 500 notes, 18 U.S.C. § 473 (1970). Because we agree that the motion to suppress was untimely we affirm the conviction.

A proper understanding of new Fed. R.Crim.P. 41(f), governing motions to suppress in the federal district courts, requires a brief examination of its predecessor, old Rule 41(e), as well as a cursory review of the amendments of the Federal Rules which may have left the meaning of present 41(f) unclear. Prior to 1972, Rule 41(e), governing motions both for return of property and for suppression, provided:

A person aggrieved by an unlawful search and seizure may move the district court for the district in which the property was seized for the return of the property and to suppress for the use as evidence anything so obtained . . . .. The motion to suppress evidence may also be made in the district where the trial is to be had. The motion shall be made before trial or hearing unless opportunity therefor did not exist or the defendant was not aware of the grounds for the motion, but the court in its discretion may entertain the motion at the trial or hearing.

The requirement that motions to suppress be made in advance of trial, although not incorporated in a rule until 1946, was in fact no more than a restatement of the existing law and practice. Advisory Committee Notes to Fed.R.Crim.P. 41(e), 18 U.S.C.A. at 213 (1961); United States v. DiRe, 159 F.2d 818, 820 (2d Cir. 1947) (L. Hand) (dic-

---

2. This indictment was consolidated for trial with another, charging Mauro with extortion, 18 U.S.C. § 894(a) (1970), in connec-

tion with the loans made to Stoppiello. Mauro was acquitted of the extortion charges.

tum), aff'd, 332 U.S. 581, 68 S.Ct. 222, 92 L.Ed. 210 (1948). The requirement that objections be timely made served a number of important purposes. Foremost among these, of course, was the need to avoid interruptions of a trial in progress with auxiliary inquiries which not only broke the continuity of the jury's attention, but also interfered with that "[d]ispatch in the trial of criminal causes [which] is essential in bringing crime to book." Nardone v. United States, 308 U.S. 338, 341–342, 60 S.Ct. 266, 268, 84 L.Ed. 307 (1939). Prompt objection to evidence which may have been illegally seized serves other objectives as well. A motion in advance of trial avoids the serious personal inconvenience to jurors and witnesses which would result from interruptions and delay once the jury had been selected and the trial had commenced. United States v. Bennett, 409 F.2d 888, 901 (2d Cir.), rehearing denied, 415 F.2d 1113, cert. denied, 396 U.S. 852, 90 S.Ct. 113, 24 L. Ed.2d 101 (1969). Cf. United States v. Allied Stevedoring Corp., 241 F.2d 925, 931 (2d Cir. 1957) (L. Hand, J.) The more telling argument is that the waste of prosecutorial and judicial resources occasioned by preparation for a trial could be avoided if a timely and successful motion were made in advance. United States v. Salli, 115 F.2d 292, 293 (2d Cir. 1940). In addition, we cannot ignore the right of immediate appeal provided to the Government by the Omnibus Crime Control Act of 1968, as amended, 18 U.S.C.A. § 3731 (Supp. 1974) (appeal from pre-trial grant of motion to suppress); see also 18 U.S.C. § 2518(10)(b) (wiretap evidence). This right would be rendered meaningless if a request for suppression could be postponed until mid-trial, when the only alternative to abandonment of the prosecution would be completion of a fruitless and sometimes lengthy trial in the hope of an ultimately successful post-trial appeal from the granting of the suppression motion.

Despite these persuasive reasons for continuation of the timeliness require-ment, the 1972 amendments to the Federal Rules of Criminal Procedure appear to have omitted the requirement from the successor to former Rule 41(e). An examination of the history of these and subsequent changes demonstrates, however, that the apparent ellipsis is due to the piecemeal adoption of rule changes rather than to any conscious purpose on the part of Congress or the rulemakers.

Present Rule 41(f), adopted in 1972, provides:

> A motion to suppress evidence may be made in the court of the district of trial as provided in Rule 12.

Present Rule 12(b) states, however, that

> (1) . . . Any defense or objection which is capable of determination without the trial of the general issue *may* be raised before trial by motion. [Emphasis supplied.]

The provision for a pre-trial motion to suppress would thus appear to be permissive rather than mandatory. That this should be the effect of the amendment to Rule 41 would be strange indeed, in the face of the advisory committee's commentary that

> The amendment to subdivision(e) [of Rule 41] and the addition of subdivision (f) are intended to require the motion to suppress evidence to be made in the trial court rather than in the district in which the evidence was seized as now allowed by the rule.

Advisory Committee Notes to Fed.R. Crim.P. 41, 18 U.S.C.A. at 60 (Supp. 1974). Because old Rule 41(e) allowed suppression motions to be brought in the district where evidence was seized as well as the district where the trial was to take place, it often resulted in needless duplication of effort. To remedy this problem, the 1972 changes prescribed distinct procedures for motions for return of property as distinguished from suppression motions. Motions for return could still be brought in the district of seizure, but motions to suppress were required to be made in the trial court. Not the slightest indication is given that the change was intended to

relax in any degree the time schedule for the making of a motion either to return or to suppress property. Only the places where such motions were to be brought were dealt with.

The confusion has its roots in the fact that amended Rule 41 was intended to be accompanied by modifications to Rule 12, which would have made clear that the requirement of timeliness was to be continued. The preliminary draft provided:

12(b) *Pre-trial Motions* . . . . The following must be raised prior to trial:

(3) Motions to suppress evidence on the ground that it was illegally obtained;

(f) . . . Failure by the defendant to raise defenses or objections or to make requests which must be made prior to trial . . . shall constitute waiver thereof, but the court for cause shown may grant relief from the waiver.

Committee on Rules of Practice and Procedure of the Judicial Conference of the United States, Preliminary Draft of Proposed Amendments to the Federal Rules of Criminal Procedure for the United States District Courts 26–29 (1970). Although proposed Rule 12 was not transmitted to Congress in 1972 as a corollary to changes in Rule 41, the difficulty obviously lay elsewhere than in these sections, for the version ultimately transmitted on April 22, 1974 differs from the preliminary draft in only insignificant respects. *See* 42 U.S.L.W. 4553 (April 23, 1974). Congress recently postponed the effective date of the amendments transmitted in April of 1974 until August 1, 1975. Pub.L.No. 93–361 (July 30, 1974).

█ Mauro makes no claim in this case of misplaced reliance upon the conjunction of the presently effective Rules 41(f) and 12(b). In these circumstances, given the persuasive indications that the 1972 amendments were not intended to abolish the requirement that suppression motions should be made in advance of trial, we find quite proper the admission of evidence of the bills taken from the steering column of Mauro's Mustang.

█ It is clear that Mauro knew early in 1972 that the column had been opened, since the car was returned to him shortly after his petition for reclamation on March 13 of that year, and he was charged $150 to have it repaired. In addition, the transcript of the July 12 conversation discloses that even before the indictment was filed both Mauro and Rosenbaum, his attorney at the time, had learned from the Customs Bureau files that Stoppiello had informed agent Viggiano of the cache. A transcript of that same conversation was given to Schacher on January 14, 1974, shortly after he was substituted for Rosenbaum as Mauro's counsel, and more than a month in advance of trial. Schacher also listened to the tapes of the conversations on January 26. Under these circumstances we find little merit to the contention that the § 3500 material, supplied at the conclusion of Stoppiello's testimony, was the first information concerning the seizure received by Mauro and his counsel. There was ample opportunity to move to suppress during the nineteen months between the return of the indictment and trial, and the failure to do so—especially in light of the other overwhelming evidence against Mauro—is fatal to Mauro's objection belatedly raised in the course of the trial.

Affirmed.