Opinions of the Colorado Supreme Court are available to the
public and can be accessed through the Judicial Branch's homepage at
http://www.courts.state.co.us. Opinions are also posted on the
Colorado Bar Association's homepage at http://www.cobar.org.

ADVANCE SHEET HEADNOTE
July 1, 2019

**2019 CO 73**

**No. 17SC541, *Cardman v. People*—Waiver Versus Forfeiture—Unpreserved Arguments to Suppress Statements—Plain Error Review.**

A detective coerced the defendant into making a confession, and the prosecution then used that confession as evidence against the defendant to convict him of multiple offenses. Before trial, the defendant sought to suppress his statements but neglected to challenge their voluntariness. As a result, the trial court did not rule on that issue and a division of the court of appeals declined to review its merits, finding that it was waived.

The supreme court agrees with the division that the voluntariness claim was not preserved. But it determines that no waiver occurred. Instead, relying on the companion case of *Phillips v. People*, 2019 CO 72, __ P.3d __, which the court also announces today, and on *People v. Rediger*, 2018 CO 32, 416 P.3d 893, it holds that the voluntariness claim was forfeited, not waived, and is thus subject to plain error review. Upon conducting such review, the court concludes that the trial court erred in admitting the defendant's statements and that the error amounts to plain error and requires reversal.

## The Supreme Court of the State of Colorado
2 East 14th Avenue • Denver, Colorado 80203

---

### 2019 CO 73

---

### Supreme Court Case No. 17SC541
*Certiorari to the Colorado Court of Appeals*
Court of Appeals Case No. 14CA202

---

**Petitioner:**

Ryan Matthew Cardman,

v.

**Respondent:**

The People of the State of Colorado.

---

### Judgment Reversed
*en banc*
July 1, 2019

---

**Attorneys for Petitioner:**
Megan A. Ring, Public Defender
Katherine Brien, Deputy Public Defender
  *Denver, Colorado*

**Attorneys for Respondent:**
Philip J. Weiser, Attorney General
Gabriel P. Olivares, Assistant Attorney General
  *Denver, Colorado*

**JUSTICE SAMOUR** delivered the Opinion of the Court.
**JUSTICE HOOD** dissents, and **CHIEF JUSTICE COATS** and **JUSTICE MÁRQUEZ** join in the dissent.

¶1 "[O]urs is an accusatorial and not an inquisitorial system—a system in which the State must establish guilt by evidence independently and freely secured and may not by coercion prove its charge against an accused out of his own mouth." *Rogers v. Richmond*, 365 U.S. 534, 541 (1961). For this reason, "convictions following the admission into evidence of confessions which are involuntary, i.e., the product of coercion, either physical or psychological, cannot stand." *Id.* at 540.

¶2 Yet Detective Paul Patton coerced Matthew Ryan Cardman into making a confession, and the prosecution then used that confession as evidence against Cardman to convict him of multiple sex offenses. Defense counsel filed a pretrial motion to suppress Cardman's statements but neglected to challenge the voluntariness of those statements. Had counsel advanced a voluntariness claim, this case might not be before us today. But because counsel neglected to do so, the trial court did not rule on it, and a division of the court of appeals declined to review its merits, concluding that Cardman waived it by failing to raise it in the trial court. We disagree with the division and therefore reverse.

¶3 For the reasons articulated in *Phillips v. People*, 2019 CO 72, __ P.3d __, a companion case we announce today, we hold that the voluntariness claim was forfeited, not waived, and is thus subject to plain error review. Upon conducting such review, we conclude that the court erred in admitting Cardman's statements at trial and that the error rises to the level of plain error requiring reversal. Accordingly, we remand to the court of appeals with instructions to return the case to the trial court for a new trial.

# I. Facts and Procedural History

¶4     A.W., a seven-year-old child, lived with her mother, A.B., and Cardman, A.B.'s boyfriend.  Although A.B. and Cardman broke up, they continued to live together.  Even after the breakup, A.B. routinely left A.W. in Cardman's care while she worked night shifts as a nurse.  This arrangement continued until A.B. married another man.  During the ensuing years, A.W. complained about chronic nightmares, inability to sleep, and stomachaches.  A.W. eventually told her stepfather that Cardman had sexually abused her on several occasions while her mother was at work.  Her stepfather then informed A.B., who called the police.  Cardman was later arrested.

¶5     As part of his investigation into A.W.'s allegations, Detective Patton conducted an audio-recorded interview of Cardman at the jail.  Cardman initially denied the allegations.  However, after the detective made certain promises, Cardman incriminated himself.  Below are excerpts from the interview reflecting such promises:

> DETECTIVE: [After a suspect invokes his right to counsel], [o]ur department policy asks that we wait twenty-four hours before we contact the suspect and give him one last shot to say—hey, this is the information we've uncovered, can you explain some things?  There is some gray area, . . . and I really just want to make sure that this stuff didn't happen as much as she's talking about. . . .
>
> Let's turn your life around right now today.  Because we can—if we can provide an explanation to help this go away for you—
>
> CARDMAN: I would love that.
>
> DETECTIVE: Okay, so then let's fix that.  Let's fix that.  Because right now, it's not going away. . . .
>
> [M]aybe you could meet [A.W.] halfway on some of those things, that we can put the icing on the cake, put this in a drawer, have her go heal, have

3

you turned around, get back with your wife, go to church, live your life, and put all of this behind you, right now today.

CARDMAN: I would love that, you have no idea.

DETECTIVE: Then let's do it. . . .

We both know where you wanna go in life and with your wife and church and everything. I'm not here to hang you, I'm not here to beat you up today. I'm here to do this [sounds of paper shuffling]. At the end of this sentence, I put this in a drawer. And I can't do that if you tell me that you had sex with this girl fifty, sixty times, I'm concerned. And then I have a different investigation. If there was some inappropriate sexual stuff that happened once or twice, I want an explanation for that so I can do this [sound of paper shuffling] and go home on my Friday, do you understand?

CARDMAN: Yeah well, believe me.

DETECTIVE: I'm trying to paint the picture, man.

CARDMAN: If I can get this all figured out, closed out, dealt with, I can go home tomorrow.

DETECTIVE: Let's do it.

CARDMAN: Believe me, that's what I want to do.

DETECTIVE: And if I can help with any of that here, I'd—you're damn skippy. . . .

Because I honestly think if you can provide some sort of corroboration and some answers, maybe even an apology or a quick sorry for whatever it is, and I give that to [A.W.], I think that would go away. . . .

What we don't want to hear is that Ryan Cardman wakes up over here every day and lusts for the sexual contact with a kid. And there's fifty, sixty times like what's she's saying. We don't want to hear that.

CARDMAN: No.

DETECTIVE: But what is explainable and what people understand is . . . it was an accident, a momentary, one-time lapse and a bad decision occurred. People understand that, okay? What people don't understand is this guy

4

over here who wakes up every day to wait 'til she's alone, 'til you're alone, to do those things. That guy is the one we're worried about. And that's the guy that we try to send to prison and to lock up and that's what I want to eliminate here today. And, Ryan, I don't think you're that guy.[1]

At the end of the interrogation, Cardman confessed to several instances of unlawful sexual contact with A.W.

¶6 The prosecution later charged Cardman with eight offenses related to three incidents of sexual assault. Before trial, Cardman moved to suppress his confession based on his rights to counsel and to remain silent. Cardman argued that: (1) two days before the interview, he invoked his right to counsel and informed the detective that he did not wish to answer questions; (2) the detective nonetheless interviewed him at the jail after a third party allegedly indicated that Cardman had changed his mind and wanted to speak with law enforcement; and (3) he never contacted law enforcement directly or asked anyone to contact law enforcement on his behalf. Following a suppression hearing, the trial court denied Cardman's motion. However, it did so without reviewing the audio-recorded interview because neither party requested its admission into evidence at the hearing. The case proceeded to trial, and a jury returned guilty verdicts on all the charges brought against Cardman. The trial court then imposed an indeterminate prison sentence with a minimum term of twelve years and a maximum term of the rest of Cardman's life.

---

[1] The audio recording is difficult to understand at times, and there is no transcript of it. We have done our best to accurately document the quoted excerpts.

5

¶7      On appeal, Cardman challenged the trial court's ruling that Detective Patton had not violated his rights to counsel and to remain silent.  But he also raised a two-part voluntariness claim that he had not advanced at the trial court—he asserted that the trial court reversibly erred when it admitted his statements without first determining (1) whether they were voluntarily made and (2) whether he was entitled to specific performance of the detective's promises.  *People v. Cardman*, 2016 COA 135, ¶ 71, __ P.3d __, *judgment vacated by Cardman v. People*, 2017 WL 1369883 (Colo. Apr. 10, 2017). In a split decision, a division of the court of appeals declined to address the merits of the unpreserved voluntariness claim, concluding that Cardman had waived it by failing to raise it in the trial court.  *Id.* at ¶¶ 60–84.  In his dissent, Judge Berger reasoned that Cardman merely forfeited the claim, which rendered it reviewable for plain error.  *Id.* at ¶¶ 123–44 (Berger, J., dissenting).  We granted Cardman's petition for certiorari, vacated the division's opinion, and ordered a limited remand so the division could reconsider its waiver ruling in light of our recent decision in *Reyna-Abarca v. People*, 2017 CO 15, 390 P.3d 816.[2]  On remand, the same division issued another split decision.  *People v. Cardman*, 2017 COA 87, __ P.3d __.  The majority stood by its previous waiver determination, *id.* at ¶¶ 20–24, while Judge Berger again asserted that Cardman's unpreserved claim was

---

[2] In *Reyna-Abarca*, we held that unpreserved double jeopardy claims can be raised for the first time on appeal and are subject to plain error review.  ¶ 2, 390 P.3d at 817–18.

forfeited, not waived, and therefore subject to plain error review, *id.* at ¶¶ 80–100 (Berger, J., dissenting).

¶8 Cardman again petitioned for certiorari review, and we granted his petition.[3]

## II. Analysis

¶9 Cardman maintains that the division erred in concluding that he waived his unpreserved claim. The prosecution disagrees and urges us to affirm the division's judgment. For the reasons set forth in *Phillips*, which relies on *People v. Rediger*, 2018 CO 32, 416 P.3d 893, we hold that Cardman's voluntariness claim was forfeited, not waived, and is subject to plain error review.[4] Undertaking such review, we conclude that Cardman's statements were involuntary and that the trial court plainly erred in admitting them into evidence. Therefore, we reverse the division's judgment and remand with instructions to return the case to the trial court for a new trial.[5]

---

[3] We granted certiorari to review the following issue:

> Whether the district court violated the petitioner's constitutional right to due process and reversibly erred by admitting statements the petitioner made to a detective, without first determining whether the statements were voluntary and whether the petitioner was entitled to specific performance of direct and/or implied promises made to him by the detective during the interrogation.

[4] We did not announce *Rediger* until after the division issued its opinion following our remand.

[5] We resolve the second part of Cardman's voluntariness claim with little difficulty. To qualify for the remedy of specific performance of promises made by an officer to a defendant, there must be "no other remedy available to the court that could approximate substantial justice under the circumstances of the case." *People v. Manning*, 672 P.2d 499, 512 (Colo. 1983). Because we conclude that a new trial without Cardman's statements is

7

## A. Cardman Forfeited His Voluntariness Claim

¶10 A waiver requires evidence of an "*intentional* relinquishment of a *known* right or privilege." *Phillips*, ¶ 16 (quoting *Rediger*, ¶ 39, 416 P.3d at 902). "When an intentional relinquishment of a known right is not present, then 'the failure to make the timely assertion of a right' is a forfeiture, not a waiver." *Id.* at ¶ 17 (quoting *Rediger*, ¶ 40, 416 P.3d at 902). Thus, while waiver requires "intent," forfeiture occurs "through neglect." *Id.* (quoting *United States v. Carrasco-Salazar*, 494 F.3d 1270, 1272 (10th Cir. 2007)).

¶11 Applying our holding in *Phillips*, *see id.* at ¶¶ 16–38, we conclude that Cardman did not waive his voluntariness claim. There is no evidence that defense counsel intended to relinquish Cardman's right to challenge the admissibility of the confession, including on voluntariness grounds. The record is barren of any indication that defense counsel considered raising the unpreserved claim before the trial court but then, for strategic or any other reason, discarded the idea. Given that Cardman's counsel clearly (and understandably) wanted the confession excluded from the trial, what benefit could he have obtained from his failure to present an *additional* ground to contest its admissibility? None comes to mind. We are equally hard pressed to think of any strategic advantage he could have gained by refraining to raise an argument that should have convinced the trial court to suppress what was "probably the most probative and damaging evidence" that could be admitted against Cardman. *See Arizona v. Fulminante*, 499 U.S. 279, 296

---

an appropriate remedy that would ensure substantial justice, he is not entitled to specific performance of the detective's promises.

8

(1991) (quoting *Bruton v. United States*, 391 U.S. 123, 139 (1986) (White, J., dissenting)). Inasmuch as defense counsel asked the trial court to suppress Cardman's statements, there is no basis to believe that he decided against raising the voluntariness issue for strategic or other reasons.

¶12     But the People nevertheless argue that Crim. P. 41(g) compels a finding of a waiver here.  As we explain in *Phillips*, we are unpersuaded.  *See Phillips*, ¶¶ 23–37.  Rule 41(g) generally requires that a motion to suppress statements "be made and heard before trial," though it permits "the court, in its discretion," to entertain the motion at trial.  Thus, unlike its federal counterpart, Fed. R. Crim. P. 12(c)(3), which permits a court to consider *any time after trial commences, including on appeal*, untimely suppression issues, the scope of Rule 41(g) is limited to a court's ability to consider such issues *at trial*.  "We do not infer from our [rule's] silence regarding post-trial proceedings that [its] drafters intended to treat as 'waived' any untimely suppression issues raised for the first time on appeal."  *Id.* at ¶ 23.

¶13     The People insist, though, that when a statute or rule includes procedural requirements, defense counsel's failure to comply with them must be deemed a waiver because attorneys are presumed to know procedural rules.  We are unpersuaded.  The People's position is not supported by *Rediger* and would lead to absurd results.

¶14     The waiver/forfeiture distinction we drew in *Rediger* did not turn on whether defense counsel was required to raise the unpreserved appellate claim by a procedural rule or by substantive law.  Nowhere in *Rediger* did we discuss the difference between procedural and substantive legal requirements.

9

¶15    Moreover, distinguishing between procedural rules and substantive law to determine whether a claim is waived or forfeited makes little sense. For example, as relevant here, Rule 41(g) sets forth the procedures for raising suppression issues related to a statement. But no one would dispute that, since a criminal defense attorney has an ethical obligation to zealously represent his client, he is required to raise such issues before trial when doing so is warranted by Fifth Amendment jurisprudence. In other words, if Rule 41(g) didn't exist, defense counsel would still have a duty to advance appropriate Fifth Amendment arguments to attempt to exclude certain statements from trial. Yet, the People would have us hold that a defense attorney's failure to comply with a procedural rule always amounts to a waiver, but a defense attorney's failure to comply with substantive law can be a forfeiture when such failure is not an intentional relinquishment of a known right. The People forget that attorneys are also presumed to know substantive law. As in *Phillips*, we see no basis to create a Rule 41(g) exception to *Rediger*.

¶16    This is not to say that there aren't compelling reasons for the procedures outlined in Rule 41(g). Nor should we be understood as minimizing the importance of compliance with that rule. But the question we confront today is neither whether the rule should be in place nor whether requiring that suppression contentions be timely raised before trial is truly necessary. The issue we address is whether an appellate court should be allowed to review for plain error when defense counsel negligently fails to raise a suppression assertion at the trial court. Consistent with *Rediger*, we answer yes.

¶17    We acknowledge that our waiver determination in *Hinojos-Mendoza v. People*, 169 P.3d 662 (Colo. 2007), does not align with this conclusion. However, as we observe in *Phillips*, *Hinojos-Mendoza* has been supplanted by *Rediger*. *See Phillips*, ¶¶ 30, 32–33.

¶18    Adhering to *Rediger*, we conclude that the failure by Cardman's counsel to raise the voluntariness claim in the trial court, without more, is not sufficient to allow us to infer that he intended to waive it. The mere failure to raise an issue neither amounts to "the type of unequivocal act indicative of a waiver" nor constitutes "the type of conduct that clearly manifest[s] any intent . . . to relinquish [the] claim." *Dep't of Health v. Donahue*, 690 P.2d 243, 247 (Colo. 1984). In *Rediger*, we declined to infer an intentional relinquishment of a known right from defense counsel's acquiescence to an erroneous jury instruction tendered by the prosecution. *Rediger*, ¶ 41, 416 P.3d at 902. Instead, we indulged "every reasonable presumption *against* waiver." *Id.* at ¶ 46, 416 P.3d at 903 (quoting *People v. Curtis*, 681 P.2d 504, 514 (Colo. 1984)). We do the same here and hold that Cardman forfeited his voluntariness claim.[6] As such, it is subject to plain error review, which we undertake next.

---

[6] We should not be misunderstood as holding that an attorney's failure to file a suppression motion or to include an argument in a suppression motion will always be deemed a forfeiture. If there is evidence in the record that defense counsel made a conscious decision to forego raising a claim for strategic or other reasons, we will not hesitate to find an implied waiver. After all, we recognize that in some situations defense counsel will refrain from seeking the suppression of an article of evidence for strategic or other reasons.

11

## B. The Trial Court Committed Plain Error

¶19    Under Crim. P. 52(b), plain error occurs when there is (1) an error, (2) that is obvious, and (3) that so undermines the fundamental fairness of the trial itself as to cast serious doubt on the reliability of the judgment of conviction. *See Hagos v. People*, 2012 CO 63, ¶ 14, 288 P.3d 116, 120.   We consider each of these three requirements in turn.

### 1. There Was an Error

¶20    Cardman frames the error question as follows: Whether the trial court erred in admitting his statements into evidence *without first determining whether they were voluntary*.  He thus maintains that if we conclude that the trial court erred, we must remand with instructions to have the case returned to the trial court for findings on the voluntariness issue.  We do not believe that remanding for further development of the record and further findings is appropriate in this situation.  Doing so would improperly place Cardman in the same position as if he had timely raised the unpreserved claim, would strip the preservation requirement of any meaning, and would dilute the rigorous plain error standard of review governing forfeited issues.  Hence, the question we must answer instead is this: Whether the trial court erred in admitting Cardman's statements into evidence *because they were involuntarily made*.

¶21    A defendant's statements may be admitted into evidence only if they are voluntary. *People v. Freeman*, 668 P.2d 1371, 1378 (Colo. 1983).  A statement is voluntary when "it is the product of an individual's 'free and rational choice.'" *People v. Taylor*, 41 P.3d 681, 694 (Colo. 2002) (quoting *People v. Mendoza-Rodriguez*, 790 P.2d 810, 816 (Colo. 1990)).  Courts recognize that "[p]sychological as well as physical pressures may be

12

brought to bear on a suspect to induce his confession." *Freeman*, 668 P.2d at 1379. Consequently, either psychological or physical coercion may render a defendant's statements involuntary under some circumstances. *Taylor*, 41 P.3d at 694. That includes a statement "extracted by any sort of threats or violence," "obtained by *any direct or implied promises, however slight*," or elicited "by the exertion of any improper influence." *Mendoza-Rodriguez*, 790 P.2d at 816 (emphasis added) (quoting *Brady v. United States*, 397 U.S. 742, 753 (1970)).

¶22    In determining whether a defendant's statements are voluntary, "we consider the totality of the circumstances surrounding the statements." *People In Interest of Z.T.T.*, 2017 CO 48, ¶ 12, 394 P.3d 700, 703. We pay particular attention to "'the significant details surrounding and inhering' in the questioning." *Id.* (quoting *People v. McIntyre*, 2014 CO 39, ¶ 16, 325 P.3d 583, 587). A defendant's statements are involuntary if the interrogating officer's behavior "was 'coercive so as to overbear the defendant's will in making the statements.'" *Id.* (quoting *McIntyre*, ¶ 16, 325 P.3d at 587); *see also Mendoza-Rodriguez*, 790 P.2d at 816 ("The question is whether the individual's will has been overborne."). It follows that, while coercive police conduct is necessary to find involuntariness, *see Taylor*, 41 P.3d at 694, coercion does not automatically nullify the voluntariness of a defendant's statements and render them inadmissible, *see Z.T.T.*, ¶ 12, 394 P.3d at 703. Rather, suppression is justified when "the coercive police conduct . . . played a significant role in inducing the statements." *People v. Zadran*, 2013 COA 69M, ¶ 12, 314 P.3d 830, 834; *accord McIntyre*, ¶ 16, 325 P.3d at 587.

13

¶23 To evaluate voluntariness, we consider "both the defendant's ability to resist coercive pressures and the nature of the police conduct." *Z.T.T.*, ¶ 13, 394 P.3d at 703 (quoting *People v. Ramadon*, 2013 CO 68, ¶ 20, 314 P.3d 836, 842). We have formulated a non-exhaustive list of factors to aid us in our analysis:

1. whether the defendant was in custody;
2. whether the defendant was free to leave;
3. whether the defendant was aware of the situation;
4. whether the police read *Miranda* rights to the defendant;
5. whether the defendant understood and waived *Miranda* rights;
6. whether the defendant had an opportunity to confer with counsel or anyone else prior to or during the interrogation;
7. whether the statement was made during the interrogation or volunteered later;
8. whether the police threatened [the] defendant or promised anything directly or impliedly;
9. the method [or style] of the interrogation;
10. the defendant's mental and physical condition just prior to the interrogation;
11. the length of the interrogation;
12. the location of the interrogation; and
13. the physical conditions of the location where the interrogation occurred.

*Id.* (alterations in original) (quoting *McIntyre*, ¶ 17, 325 P.3d at 587).

¶24 Here, eight factors appear to support a finding of involuntariness: Cardman was in custody at the time of the interrogation (factor 1); he was not free to leave because he was in custody (factor 2); he did not have an opportunity to confer with counsel beforehand (factor 6); he made incriminating statements during the interrogation (factor 7); the detective made promises to him to induce his incriminating statements (factor 8); the method of the interrogation was coercive given the detective's repeated promises (factor 9); and the interrogation took place at the jail (factors 12 and 13).

14

¶25 On the other side of the ledger, only four factors appear to weigh in favor of voluntariness: although Cardman may have had little more than an inkling about the detective's investigation before the meeting at the jail, shortly after sitting down for his interview, he became aware that A.W. had made sexual allegations against him (factor 3); the detective read him his *Miranda* rights (factor 4); he said he understood those rights and then waived them (factor 5); and his mental and physical condition just before the interrogation seemed normal (factor 10).

¶26 And one factor appears to be neutral: The interview lasted approximately one hour (factor 11).

¶27 But the analysis is not quantitative—we do not simply count the number of factors on each side of the equation and see which side has more. The reason is twofold: We do not accord the same weight to each of the thirteen factors, and how much weight we accord each factor in a particular case depends on the circumstances involved. This case illustrates the point. As we set forth in more detail next, given the detective's repeated promises during the interrogation, factors 8 and 9 are dispositive. Hence, even if all the other factors favored a finding of voluntariness, we would still conclude that Cardman's statements were involuntarily made.[7]

_____

[7] We understand that it is the prosecution's burden to prove by a preponderance of the evidence that Cardman's statements were voluntarily made, *see Mendoza-Rodriguez*, 790 P.2d at 816, and that the prosecution did not have an opportunity to attempt to meet its burden because Cardman did not raise the voluntariness issue in the trial court. But here, our conclusion is predicated on the repeated promises made by the detective to lure

15

¶28 The interview was coercive and disturbing. Cardman initially denied doing anything of a sexual nature with A.W. The detective told Cardman that he did not believe him. But Cardman remained steadfast in his denial. As the interrogation progressed, though, the detective conveyed to Cardman that the case would go away and would not proceed if Cardman met A.W. halfway and apologized to her. When the detective said, "if we can provide an explanation to help this go away for you," Cardman interrupted him: "I would love that." And the detective responded with encouragement: "Okay, so then let's fix that. Let's fix that. Because right now, it's not going away." The detective later added that he could put the case "in a drawer," have A.W. "go heal," have Cardman "turned around, get back with [his] life, go to church, live [his] life . . . and put all of this behind [him], right now today." Cardman replied: "I would love that, you have no idea." And the detective again encouraged him: "Then let's do it." Even then Cardman did not admit any of A.W.'s allegations, though he acknowledged an incident in which she sat on his lap, an incident which she might have misconstrued as inappropriate touching, a few instances in which she walked in on him masturbating, and a few instances in which she walked in on him and her mother having sex.

¶29 The detective kept pushing Cardman, however, reminding him that he knew where Cardman wanted to go in life with his wife and his church. He then told Cardman

---

Cardman into making incriminating statements, and we have access to the audio recording of the interview.

16

that he could put the case "in a drawer" if Cardman admitted to some "inappropriate sexual stuff." According to the detective, if there was inappropriate sexual conduct with A.W. that happened just once or twice, as opposed to having had sex with her fifty or sixty times, he wanted an explanation so he could set the case aside and "go home on [his] Friday." After the detective asked Cardman if he understood what he was telling him, he added that he was "trying to paint the picture" for him. Cardman then appeared to seek confirmation that his understanding of the detective's promises was accurate: "If I can get this all figured out, closed out, dealt with, I can go home tomorrow." And the detective responded: "Let's do it."

¶30 Only then did Cardman confess to inappropriate sexual conduct with A.W. Specifically, Cardman admitted that: (1) he had gotten an erection three times while A.W. sat on his lap and had ejaculated two of those times; (2) he had touched A.W. around the crotch area, become aroused, and ejaculated; and (3) when A.W. had sat on his lap on a computer chair with her legs straddling, the rubbing motion had caused him to get an erection.

¶31 At the end of the interview, the detective spoke as follows: "I think I can put a period on this and put this away. I hope you can too. . . . We move forward from right now today. And I think you do that with your best spirit in mind, your wife's best spirit in mind, your kids' best spirit in mind." He then asked Cardman to write a brief note apologizing to A.W. so that she could get some closure and put this behind her. Cardman did so and apologized to A.W. in writing, saying "I apologize for the instances of sexual

17

content [sic] between you and I. I never meant for them to happen and wish I could take it all back."

¶32 This is precisely the type of interview that flies in the face of one of the bedrock principles of our criminal jurisprudence: The State may not prove a charge by obtaining a confession from the accused through coercion. *Rogers*, 365 U.S. at 540–41. Detective Patton elicited incriminating statements from Cardman by repeatedly promising that, if he met A.W. halfway, apologized to her, and admitted to some inappropriate sexual conduct with her that was not as egregious as sexually assaulting her fifty to sixty times, he would not be prosecuted for it. Cardman then admitted to inappropriate sexual conduct with A.W. on a few occasions, and the State later used those admissions to obtain a conviction against him. Because Cardman's will was overborne by police coercion, we conclude that his statements were involuntarily made. Therefore, it was error for the court to admit them into evidence at trial.

## 2. The Error Was Obvious

¶33 Having found there was an error, we next consider the second prong of our plain error analysis. We rule that the error was obvious.

¶34 In general, to be plain, an error must "be so obvious" at the time it is made "that a trial judge should be able to avoid it without the benefit of an objection." *Scott v. People*, 2017 CO 16, ¶ 16, 390 P.3d 832, 835. "For an error to be this obvious, the action challenged on appeal ordinarily 'must contravene (1) a clear statutory command; (2) a well-settled legal principle; or (3) Colorado case law.'" *Id.* (quoting *People v. Pollard*, 2013 COA 31M, ¶ 40, 307 P.3d 1124, 1133). An error may be obvious when the issue on appeal has been

18

decided by our court or a division of the court of appeals. *People v. Ujaama*, 2012 COA 36, ¶ 42, 302 P.3d 296, 304–05.

¶35 The admission of Cardman's statements at trial contravened both well-settled legal principles and Colorado case law. Therefore, the error was obvious and the trial court should have been able to avoid it without the benefit of an objection.

¶36 In fairness to the court, we recognize that the first opportunity it had to avoid the error was during trial because neither party sought to introduce the audio-recorded interrogation at the pretrial hearing held on Cardman's suppression motion. As a result, avoiding the error may well have required the declaration of a mistrial. But we consider Cardman's case an anomaly in which a confluence of factors created the proverbial perfect storm. For five reasons, we anticipate that today's opinion will not lead to more mistrials. First, the vast majority of defense attorneys would have spotted the voluntariness issue in this case and would have raised it in a timely fashion. Second, we perceive little risk of sandbagging. *See Phillips*, ¶ 29. Third, the prosecution is always free to make a record about any glaring suppression issue to document that defense counsel is aware of it and is choosing not to raise it. Fourth, a mistrial would be required only when necessary to avoid obvious error. And finally, recordings of interrogations containing incriminating statements are typically provided to the trial court before or during pretrial suppression hearings.

¶37 We do not anticipate that this opinion will burden our colleagues on the court of appeals either. Defense attorneys have every incentive to raise all meritorious suppression issues before trial. *Id*. Failure to do so risks, among other things, an

inadequate appellate record that cannot establish plain error. Of course, it hardly bears stating that in the suppression context, a well-developed factual record is usually pivotal.

¶38 But, regardless of the consequences, our task at this juncture of the analysis is to determine whether the error in admitting Cardman's statements at trial was obvious. Because we conclude that it was and that the trial court should have been able to avoid it without an objection, we proceed to consider the last requirement of plain error analysis.

### 3. The Error Undermined the Fundamental Fairness of the Trial

¶39 The question still remains whether the trial court's obvious error "so undermined the fundamental fairness of the trial itself so as to cast serious doubt on the reliability of the judgment of conviction." *Hagos*, ¶ 14, 288 P.3d at 120 (quoting *People v. Miller*, 113 P.3d 743, 750 (Colo. 2005)). In other words, we must "determine whether a reasonable possibility exists that [any error] . . . contributed to [the] conviction." *People v. Lozano-Ruiz*, 2018 CO 86, ¶ 5, 429 P.3d 557, 578.

¶40 The trial court's obvious error permitted the jury to consider Cardman's incriminating statements. Because this was largely a he-said-she-said case, Cardman's confession was by far the strongest evidence against him. Under all the circumstances present, we have little difficulty concluding that the admission of the statements seriously undermined the fundamental fairness and integrity of the trial. In our view, there is a reasonable possibility that the trial court's error in admitting Cardman's confession contributed to his conviction. Were we to find no plain error and to leave the judgment of conviction intact, it would lead any objective observer to conclude that an injustice was perpetrated on Cardman. This we are unwilling to allow. "[A]bove all, it is the appellate

20

court's responsibility to avoid a miscarriage of justice for a defendant even when defense counsel fails to object to serious errors at trial." *People v. Nardine*, 2016 COA 85, ¶ 64, 409 P.3d 441, 453–54. And "[e]nsuring fundamental fairness in trial is the beacon of plain error review." *Id.*

¶41 In sum, we determine that the trial court erred in admitting Cardman's statements and that the error rises to the level of plain error. Therefore, we cannot allow Cardman's judgment of conviction to stand.

### III. Conclusion

¶42 In today's decision, and in *Phillips*, we do no more than apply our holding in *Rediger*. We recognize that some would have us invoke the drastic measure of waiver, which would then force Cardman to take his chances with a Crim. P. 35(c) ineffective-assistance-of-counsel claim. In our view, the more just path, and the one most faithful to the law, is the one we take.

¶43 We conclude that Cardman did not waive his voluntariness claim by failing to raise it in the trial court. Instead, we hold that the claim was forfeited and is subject to plain error review. Because we determine that the trial court plainly erred in admitting Cardman's statements, we reverse the division's judgment and remand with instructions to return the case to the trial court for a new trial.

**JUSTICE HOOD** dissents, and **CHIEF JUSTICE COATS** and **JUSTICE MÁRQUEZ** join in the dissent.

21

JUSTICE HOOD, dissenting.

¶44    The adage about bad facts sometimes making bad law seems to hold true today. By extending plain error review to unpreserved suppression claims, the majority essentially nullifies a long-standing and controlling rule of criminal procedure. Moreover, in doing so, it undermines the policy objectives of the rule and places an unreasonable burden on trial courts and the court of appeals. Therefore, I respectfully dissent.

## I.  Analysis

### A.  Crim. P. 41(g) Requires Motions Like the One Here to Be Filed Before Trial

¶45    Since 1970, criminal defendants in Colorado have been required by rule to challenge involuntary confessions or admissions before trial:

> A defendant aggrieved by an alleged involuntary confession or admission made by him, may make a motion under this Rule to suppress said confession or admission.  The motion *shall be made and heard before trial* unless opportunity therefor did not exist or defendant was not aware of the grounds for the motion . . . .

Crim. P. 41(g) (emphasis added).  The trial court "may" address such a motion at trial, but its decision in that respect is purely discretionary.  *See id.*

¶46    For many years, we rejected efforts by criminal defendants to raise suppression issues on appeal when the issues were not properly raised before the trial court.  *See, e.g.*, *People v. L.A.*, 609 P.2d 116, 118–19 (Colo. 1980) (remanding for further proceedings to determine whether a juvenile-defendant's statements were voluntary because, though the issue was raised in the motion to suppress, the trial court did not make findings on

1

this question during the suppression hearing); *People v. Cobb*, 690 P.2d 848, 853 (Colo. 1984) (refusing to consider the merits of a defendant's claim that his Fifth Amendment rights were violated because the argument "was not raised in [the] motion to suppress the evidence, nor was it argued before the trial court"); *People v. Gouker*, 665 P.2d 113, 117–18 (Colo. 1984) (rejecting the defendant's argument that he was arrested pursuant to an invalid warrant because he failed to contest its validity at the suppression hearing). While these cases do not rely explicitly on Crim. P. 41, they demonstrate how entrenched this form of procedural default is.

## B. Crim. P. 41 Serves Many Important Policy Objectives

¶47    Presumably, this rule, and caselaw to the same effect, has endured because there are so many compelling reasons for it. *See* 6 Wayne R. LaFave, Search and Seizure: A Treatise on the Fourth Amendment § 11.1(a) (5th ed. 2014). ("[T]here are many valid reasons underlying the practice of requiring pretrial motions, which doubtless explains why so many jurisdictions now subscribe to that approach."). Requiring pretrial litigation of suppression issues helps to:

- prevent "the waste of prosecutorial and judicial resources occasioned by [trial] preparation," *United States v. Marro*, 507 F.2d 802, 806 (2d Cir. 1974); *accord* LaFave, *supra*;

- permit the defendant, when suppression is denied, to "plead guilty and gain whatever concessions might be obtained by so pleading without causing the commencement of a trial" or change trial strategy, LaFave, *supra*;

- "permit the government to change the theory of its case, to develop or place greater reliance upon untainted evidence or otherwise to modify its trial strategy [in the event of an adverse ruling]," *United States v. Sisca*, 503 F.2d 1337, 1348 (2d Cir. 1974);

- allow the prosecution to pursue an interlocutory appeal of an adverse pretrial suppression ruling before jeopardy attaches, *People v. Traubert*, 608 P.2d 342, 348 (Colo. 1980) ("Since the prosecution is precluded from placing a defendant in double jeopardy after a verdict has been rendered, its only meaningful avenue of appeal must be found in a pre-judgment proceeding.");

- "avoid interruptions of a trial in progress with auxiliary inquiries" and ensure the jury remains focused on the issues presented at trial, *United States v. Mauro*, 507 F.2d 802, 806 (2d Cir. 1974);

- prevent "serious personal inconvenience to jurors and witnesses which would result from interruptions and delay once the jury had been selected and the trial had commenced," *id.*; and

- "avoid the necessity of declaring a mistrial because the jury has been exposed to unconstitutional evidence, with resulting repetitive litiga[t]ion," *State v. Lawrence*, 255 So. 2d 729 (La. 1971).

¶48　Similarly, we insist that motions to suppress "should state with reasonable specificity the legal grounds upon which the motions are based." *People v. Jansen*, 713 P.2d 907, 912 n.8 (Colo. 1986). We require such specificity to ensure "the prosecution [is] on notice of the contentions it must be prepared to meet at a suppression hearing and to inform the court of the issues to be decided." *Id.* After all, when considering a motion to suppress based on the alleged involuntariness of the confession, the trial court "must make sufficiently clear and detailed findings of fact and conclusions of law *on the record* to permit meaningful appellate review." *People v. McIntyre*, 789 P.2d 1108, 1110 (Colo. 1990). Without factual determinations from the trial court, "appellate review may be impossible, requiring remand for further findings." *Id.*

¶49　In sum, Crim. P. 41(g) serves an essential role—it ensures that the parties and trial courts do not waste time and resources pursuing claims that could be resolved in pretrial proceedings.

3

## C. There Is No Constitutional Right to a Hearing on the Voluntariness of a Confession, in the Absence of Objection

¶50 What, then, is the legal basis for deviating from the rule here? It's certainly not the existence of an applicable federal constitutional right. For there is none. *See Wainwright v. Sykes*, 433 U.S. 72, 86 (1977) (rejecting the notion that "a defendant has a right under *Jackson v. Denno* to a hearing as to the voluntariness of a confession, even though the defendant does not object to its admission" (citation omitted)).[1] And we have never recognized such a right under any source of Colorado law.

## D. The Majority's Reliance on *Rediger* Is Misplaced

¶51 The majority relies on our recent decision in *People v. Rediger*, 2018 CO 32, 416 P.3d 893, as a broad game changer regarding plain error review. *See* maj. op. ¶¶ 9, 17; *see also Phillips v. People*, 2019 CO 72, ¶¶ 21–22, __ P.3d __. And that it was. But, *Rediger* did not address whether waiver is implied when a defendant fails to lodge an objection required by rule or statute. *See Rediger*, ¶¶ 39–47, 416 P.3d at 902–903. Therefore, *Rediger* is plainly distinguishable.

¶52 In *Rediger*, the defendant failed to make a contemporaneous objection to an allegedly erroneous jury instruction. *See id.* at ¶¶ 9–10, 12, 416 P.3d at 898. Defense

---

[1] *Wainright* analyzed Florida's rule, which is almost identical to Colorado's Crim. P. 41(g). 433 U.S. at 76 & n.5. As relevant here, Florida Rule Crim. Proc. 3.190(i)(2) sets forth:

> The motion to suppress [a confession or admission illegally obtained] shall be made before trial unless opportunity therefor did not exist or the defendant was not aware of the grounds for the motion, but the court in its discretion may entertain the motion or an appropriate objection at the trial.

4

counsel additionally stated that the "defense [was] satisfied" with the instructions. *Id.* at ¶ 10, 416 P.3d at 898. Yet, we still concluded that, based on the record, there was no evidence that the defendant "either express[ly] or implied[ly] . . . intended to relinquish his right to be tried in conformity with the charges set forth in his charging document." *Id.* at ¶ 42, 416 P.3d at 902. There simply wasn't enough evidence in the record to establish such an intent, and accordingly, because "we must indulge 'every reasonable presumption *against* waiver,'" we concluded that the defendant had *forfeited* his claim, and had not waived it. *Id.* at ¶¶ 46–47, 416 P.3d at 903 (emphasis added) (quoting *People v. Curtis*, 681 P.2d 504, 514 (Colo. 1984)).

¶53    Conspicuously absent in *Rediger*, however, was a rule like Crim. P. 41(g), which generally *mandates* that a defendant file a motion to suppress an involuntary statement before trial.[2]

## E.  *Hinojos-Mendoza* **Should Control**

¶54    We saw this type of problem only a dozen years ago in *Hinojos-Mendoza v. People*, 169 P.3d 662, 665, 670 (Colo. 2007), when we found waiver of a defendant's confrontation right based on defense counsel's failure to file a statutorily required motion challenging the use of certain evidence. In *Hinojos-Mendoza*, the defendant was charged with intent to distribute cocaine. *Id.* at 664. A lab technician tested the recovered substances and wrote a report identifying the substance as cocaine. *Id.* At trial, the People introduced

---

[2] Moreover, the limited discussion of implied waiver in *Rediger* is dicta because implied waiver was not at issue there.

5

the lab report without calling the technician as a witness. *Id.* The defendant objected on hearsay grounds. *Id.* The trial court ruled against the defendant because a statute, section 16-3-309(5), C.R.S. (2006), authorized the admission of the report without the responsible technician's testimony and set out pretrial procedures a defendant would have to follow to question the technician at trial. *Hinojos-Mendoza*, 169 P.3d at 664–65. In response to questioning from the court, defense counsel admitted that "he had not requested the lab technician's presence because he was unaware of the statute." *Id.* at 664. On appeal, the defendant argued the admission of the lab report without accompanying testimony from the lab technician violated his Sixth Amendment confrontation rights. *Id.* at 665.

¶55 We noted that "[w]hether a particular right is waivable; whether the defendant must participate personally in the waiver; whether certain procedures are required for waiver; and whether the defendant's choice must be particularly informed or voluntary, all depend on the right at stake." *Id.* at 669 (quoting *United States v. Olano*, 507 U.S. 725, 733 (1993)). Rights that are personal to the defendant, such as the right to counsel, the right to testify, the right to trial by jury, are "sufficiently personal and fundamental as to require a voluntary, knowing, and intentional waiver by the defendant himself." *Id.* (citing *Curtis*, 681 P.2d at 511). But, whether to waive other rights, including the right to confrontation, are strategic decisions that fall to defense counsel to make. *See id.* Thus, we concluded that defense counsel could waive the defendant's right to confront the lab technician by not complying with the procedural requirements set out in the relevant statute. *Id.* at 670. And because "we presume that attorneys know the applicable rules of procedure," we reasoned that "we can infer from the failure to comply with the

6

procedural requirements that the attorney made a decision not to exercise the right at issue." *Id.*

¶56    So, where a statute or rule sets forth procedural requirements to challenge evidence with which counsel fails to comply, such failure constitutes an implied waiver of the opportunity to challenge that evidence. *See id.* Counsel is presumed to know the applicable rules of procedure, and a failure to adhere to those rules creates a basis to infer "that the attorney made a decision not to exercise that right at issue." *Id.* Contrary to the majority's conclusion, *Rediger* didn't "supplant[]" this analysis. *See* maj. op. ¶ 17; *see also Phillips*, ¶ 30. It didn't even address the situation before us now.[3]

### F. The Majority's Decision Places an Unreasonable Burden on Judges

¶57    As the majority below observed, our holding today imposes an unreasonable burden on the trial courts:

> [T]o require the trial court to hold a hearing on the voluntariness of a defendant's statements where the issue becomes apparent during trial would be overly burdensome and inefficient. Such an obligation could require a trial court in the middle of trial to sua sponte (1) order a new

---

[3] And were we to abide by our existing precedent — and hold that failure to comply with the requirements of Crim. P. 41(g) constitutes a waiver, rather than a forfeiture — we would not be alone. *See, e.g.*, *Hernandez v. State*, 757 S.E.2d 109, 110–11 (Ga. 2014) (holding that a defendant's failure to file a pretrial motion to suppress, as required by statute, resulted in a failure to preserve a claim for appellate review); *State v. Miller*, 814 S.E.2d 81, 83–86 (N.C. 2014) (holding that plain error review was improper when the defendant failed to timely file a motion to suppress as required by statute, and, thus, the defendant "completely waived appellate review" of his Fourth Amendment claims); *Rodriguez v. State*, 435 P.3d 399, 408–09 (Wy. 2019) (concluding that failure to file pretrial motions to suppress, as required by Wyoming's procedural rules, without good cause for the failure can constitute waiver).

suppression hearing on the issue of voluntariness; (2) declare a mistrial; (3) convene a new jury; and (4) begin a new trial (even where the confession may have been allowed).

*People v. Cardman*, 2017 COA 87, ¶ 31, __ P.3d __; *see also Miller*, 814 S.E.2d at 84–85 (outlining potential burdens for the prosecution if plain error review is used in reviewing suppression claims raised for the first time on appeal).

¶58   The systemic implications don't end with the trial courts. Divisions of the court of appeals must now scour the record in far more cases for plain error, even when defense counsel fails to comply with Crim. P. 41(g). All this, when we already have another long-standing rule that can address Cardman's primary concern without so much disruption to our criminal justice system.

## G. Cardman's Remedy Is Crim. P. 35(c)

¶59   Rule 35(c) is the proper mechanism for addressing what lies at the heart of Cardman's claim—whether he received ineffective assistance from his trial counsel. *See Cardman*, ¶¶ 61–63 (Bernard, J., concurring) ("[F]iguring out why defense counsel did not file a motion to suppress is a foundational question . . . ."). Postconviction proceedings are best suited to handle "situations in which facts outside the record [are] critical" to resolving a defendant's claims. *See Moore v. People*, 2014 CO 8, ¶ 14, 318 P.3d 511, 517; *cf. People v. Kirk*, 221 P.3d 63, 65 (Colo. App. 2009) ("We are not authorized to make this factual finding in the first instance, and this is not a case in which the record supports but one inference." (citation omitted)). What's missing from the record here is an explanation of why Cardman's defense counsel failed to challenge the voluntariness of his statements in his motion to suppress—was it a strategic choice or an oversight?

8

¶60     Furthermore, analyzing claims such as Cardman's through an ineffective assistance of counsel lens rather than plain error could prove more advantageous to defendants. "[T]he error in a claim of ineffective assistance of counsel must impair the reliability of the judgment of conviction to a lesser degree than a plain error in order to warrant reversal of the conviction." *Hagos v. People*, 2012 CO 63, ¶ 19, 288 P.3d 116, 120–21. "Plain error review allows the opportunity to reverse convictions . . . presenting particularly egregious errors, but reversals must be rare to maintain adequate motivation among trial participants to seek a fair and accurate trial the first time." *Id.* at ¶ 23, 288 P.3d at 121–22. And if the harm suffered by Cardman was so great as to satisfy plain error, then it would certainly satisfy the prejudice prong of the *Strickland* standard for ineffective assistance of counsel. *See id.* at ¶ 19, 288 P.3d at 121–22 ("Plain error casts serious doubt on the judgment of conviction. Deficient performance of counsel, on the other hand, undermines confidence in the judgment of conviction.").[4]

---

[4] Crim. P. 35(c) allows defendants to begin the postconviction review process without going through the direct appeal process:

> Notwithstanding the fact that no review of a conviction of crime was sought by appeal within the time prescribed therefor, or that a judgment of conviction was affirmed upon appeal, every person convicted of a crime is entitled as a matter of right to make application for postconviction review upon the grounds hereinafter set forth. . . .

Therefore, if a speedy remedy is the concern, one at least as speedy as direct appeal remains available. And though there is no Sixth Amendment right to court-appointed counsel for indigent defendants seeking postconviction relief, *see Duran v. Price*, 868 P.2d 375, 379 (Colo. 1994), district courts have discretion to appoint counsel in Rule 35(c) motions, *see Murphy v. People*, 863 P.2d 301, 304 n.9.

9

## II. Conclusion

¶61    Cardman waived the challenge he seeks to make here. The majority's contrary conclusion is at odds with Crim. P. 41(g) and our decision in *Hinojos-Mendoza*. The defendant's potential remedy for counsel's failure to comply with the requirements of Crim. P. 41(g) is found in Crim. P. 35(c). By making factual findings regarding the detective's behavior and decisions by defense counsel, the majority usurps the role of the trial courts.

¶62    For all these reasons, I respectfully dissent.

I am authorized to state that CHIEF JUSTICE COATS and JUSTICE MÁRQUEZ join this dissent.

10